**STATE of Missouri, Respondent,**

v.

**Robert R. FRISTOE, Appellant.**

**No. WD 31569.**

Missouri Court of Appeals,
Western District.

Aug. 4, 1981.

Kenneth D. Ksyser, Moberly, for appellant.

John Ashcroft, Atty. Gen., Jefferson City, Darrell Panethiere, Asst. Atty. Gen., Kansas City, for respondent.

Before PRITCHARD, P. J., and TURNAGE and CLARK, JJ.

PRITCHARD, Presiding Judge.

Appellant was by the verdict of a jury convicted of rape of W_____ T_____ and kidnapping of L_____ H_____, the crimes being alleged to have been committed on December 30, 1978. He was found by the court to be a second offender and was sentenced by it on the rape conviction to 30 years imprisonment, and upon the kidnapping conviction to 10 years imprisonment, in the Division of Corrections, the sentences to run consecutively.

Appellant first challenges the submissibility of the state's case. The two girls were driving from Moberly to Higbee, Missouri, to see a friend, when the car, driven by L_____, slid off a curve and into a ditch. They left the car and went to the nearest home to use a phone. It was dark (2:30 a. m.) and the girls used a flashlight which W_____ T_____ had received as a Christmas present. There were lights on in the home and vehicles in its driveway. As the girls walked to the house, a white car drove by slowly two times, and when they discovered that no one was home, the white car pulled in the driveway and its engine was stopped. Its driver was appellant who was told that the girls needed help. He went into the house, which belonged to his parents, but returned saying that he could not

find a telephone book. He agreed to give the girls a ride to get a wrecker, and they got into the front seat of the car, W_____ T_____ in the middle and L_____ H_____ on the right. They drove for awhile and stopped, appellant saying that he had to go to the restroom. When he got back into the car, he pointed a gun at L_____ H_____'s head and told her to get down on the floorboard. As she did so, she dropped the flashlight under the seat. They drove on for awhile and stopped, and appellant handcuffed L_____ H_____'s hands behind her back and started driving again. He stopped again and told L_____ H_____ to get into the back seat which she did, and while she was lying there on her stomach, appellant ordered W_____ T_____ to take off her shirt, but she took off her shoes instead, after which he drove on. Then appellant stopped the car, took off his clothes and at gun point forced W_____ T_____ to take off her clothes and to have sexual intercourse with him. He then drove on, stopped again, told W_____ T_____ to get on her knees and then performed anal intercourse upon her. W_____ T_____ testified that appellant had a six shot .22 caliber handgun pointed at them, and he constantly threatened to kill them. At one point he stopped at a red barn, made both girls get out, put the gun to each girl's head, pulled the hammer back but did not fire. He said, "Murder or rape—it doesn't make any difference". Later, at a gasoline station, appellant pulled out a hunting knife and ran it up and down W_____ T_____'s leg. About 7:30 a. m., the girls were released at Renick, Missouri, having spent over five hours with appellant.

L_____ H_____ had a conference with Sheriff Orville Price that afternoon. She knew appellant from work, but had not recognized him until later during the encounter with him. The girls told the sheriff that appellant's name was Robert Fristoe; that L_____ H_____ had left the flashlight under the passenger seat of his car; that appellant was carrying a hunting-type knife; and a 6 shot .22 caliber pistol. They described appellant's car as a white LeSabre with a green interior, with an oil filter, beer tabs and a book on the floor, and it was very dirty.

■ Appellant's Point I is that there "was insufficient proof of rape and kidnapping due to the inconsistencies in the testimony of the alleged victim". The inconsistencies which appellant claims are these: The girls were out all night without permission and therefore had a reason for creating a story which justified their absence; L_____ H_____, at the preliminary hearing held about two weeks after the crimes were alleged to have been committed, could not remember where she was during the afternoon before the rape and kidnapping, but at trial, almost a year later, she did so remember; L_____ H_____ testified that there was, on the evening preceding the alleged rape and kidnapping, a Christmas dinner that she attended at W_____ T_____'s place of employment right beside the police station, but another employee testified that the dinner took place at the Peppermill; W_____ T_____ testified that she slept most of the day and did not work on that day following the alleged rape, while the time records, according to a company payroll administrator, showed W_____ T_____ worked from 11:45 a. m. to 12:50 p. m., on December 30, 1978, doing janitorial work.

None of these inconsistencies tend to discredit the direct and positive evidence supporting the state's cases, which, considered in its light most favorable to the state and disregarding all evidence to the contrary, show that W_____ T_____ was forced at gunpoint to disrobe and submit to appellant, between the time of 2:30 a. m. and 7:30 a. m., on December 30, 1978. During that time, L_____ H_____ was handcuffed and forced to remain in appellant's car. At most, the inconsistent evidence bore on collateral matters and did not concern the crime at all. Appellant was positively identified as the culprit. As to each of the alleged crimes, each victim corroborated the other. See *State v. Johnson*, 595 S.W.2d 774, 776 (Mo.App.1980), where the court said, "[t]he testimony of the victim is not considered to be 'clouded with doubt' or

'extremely doubtful' * * * merely because she falls into inconsistencies or contradictions as to minor points of a nonessential nature." Note also *State v. Dighera*, 617 S.W.2d 524 (Mo.App.1981), where as to alleged inherent contradictions of a deaf, mute and blind victim, "[i]t was for the jury to assess the inference of coercion against the inference of voluntary consent the disparate evidence raises." See also *State v. Hires*, 583 S.W.2d 204 (Mo.App.1979); *State v. Weekly*, 223 S.W.2d 494 (Mo.1949); and *State v. Baldwin*, 571 S.W.2d 236 (Mo. banc 1978), holding that rape convictions may be had upon the uncorroborated evidence of the prosecutrix.

As to the kidnapping of L_____ H_____, *State v. Johnson*, 549 S.W.2d 627, 631[6, 7] (Mo.App.1977), states the rule: "The crime of kidnapping requires proof of a forcible seizure, confinement, inveiglement or enticement of another with intent to asport or secretly confine the other against his will. § 559.240. The essence of the offense is the involuntary restraint of liberty [*State v. Brown*, 217 S.W.2d 546, 548[3] (Mo.1949)] with specific intent to confine the victim. *State v. Higgs*, 325 Mo. 704, 29 S.W.2d 74, 75[1] (1930)." The evidence is clear that appellant handcuffed L_____ H_____'s hands behind her back, ordered her into the back seat of the car where she remained for about 5 hours, during which appellant drove the car for some distances. Sheriff Price testified that he observed marks on L_____ H_____'s wrists the following morning, the marks being described by him as being like those made by handcuffs which were too tight, and were left on for some time. Appellant's testimony was that there was consent to the act of sexual intercourse, and that they went with him willingly. The evidence above related refutes that position, and appellant's contention that his motion for judgment of acquittal should have been sustained is rejected.

■ By his second point, appellant questions the warrantless search of his automobile and the seizure therefrom of a flashlight, admitted into evidence, belonging to victim W_____ T_____. The victims had told Sheriff Orville Price on the day after the crimes that the perpetrator was appellant, and that L_____ H_____ had left W_____ T_____'s new flashlight under the passenger seat of the white LeSabre he was driving. The girls also told the sheriff that appellant carried a hunting-type pocket knife and a .22 caliber pistol. Armed with an arrest warrant, Sheriff Price, accompanied by five deputies on New Year's Day, saw appellant's automobile near his residence and stopped it to arrest him. Appellant, being alone in the car, was removed from it and placed under arrest. He stood by the driver's door as directed and the sheriff told him to put his hands on top of the car " * * * [s]pread-eagle, which he did, and he was handcuffed and was right there. He wasn't told to stand at all then, after his hands was cuffed." Deputy Wolverton had removed appellant from his car and told him to put his hands on top of it. Wolverton then conducted a "pat-down" or "pat-frisk" of appellant and discovered a single-bladed pocket knife in his right front pants pocket. With the five deputies standing around, and appellant outside of it, the car was searched, acknowledged to be without a warrant. "Q. Was there any search made of the car? A. Just temporary there for the flashlight—the handcuffs and the gun and the flashlight was found under the front seat—right there under the front seat on the passenger's side." That was where the girls had told the sheriff the flashlight would be found. Although the sheriff's answer, supra, is not clear, apparently no handcuffs, which were used on L_____ H_____, were found, and no gun was found. As to the flashlight, the sheriff testified on cross-examination: "Q. Was the flashlight in plain view? A. I didn't pick up the flashlight, but we didn't have to search the car for the flashlight, we didn't even have to get in the car. Ah, the Deputy picked it up so if it was in absolute plain view, I couldn't say. Q. Did you say it was under the seat? A. Under the edge of the front seat. That's what she said." Sheriff Price testified further that they were searching the car because he was afraid for

his personal safety. According to Wolverton, the car was impounded.

*Chimel v. California*, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969), limited the right to search incident to a lawful arrest to the person of the arrestee and the area (there a personal residence) within his immediate control. The rule is much relaxed in the case of a search of an automobile, principally because of its mobility. *Chambers v. Maroney*, 399 U.S. 42, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1970); note also *Texas v. White*, 423 U.S. 67, 96 S.Ct. 304, 46 L.Ed.2d 209 (1975), allowing the warrantless search of an automobile upon probable cause that it contained contraband. In *State v. Daly*, 560 S.W.2d 253 (Mo.App. 1977), officers had been given a description of the automobile used in the robbery, the suspect, and his name and address. They knew a gun had been used in the robbery, and saw in plain view in the car clothing matching that worn by the robber, which provided a reasonable suspicion that the revolvers were hidden somewhere in the automobile, hence probable cause existed for a search of the automobile. See also *State v. Achter*, 512 S.W.2d 894 (Mo.App. 1974). Here, Sheriff Price knew that a gun had been used in the crimes; that handcuffs were used; and that a victim's flashlight had been left under the seat of the car. Probable cause thus existed to search the car. It should also be remembered that appellant was arrested in his car near his parents' residence, and thus there was a need to prevent any possible loss of evidence occasioned by the car's mobility and its access by other persons. The matter of a warrantless search of a passenger compartment of a car, incident to a custodial arrest, was very recently covered in *State of New York v. Belton*, —— U.S. ——, 101 S.Ct. 2860, 69 L.Ed.2d 768 (1981). There an officer stopped a speeding car with four men in it, none of whose identification matched the car's registration. The policeman smelled burnt marihuana, and saw on the floor of the car an envelope marked "Supergold" which he associated with marihuana. The men were directed to get out of the car and were placed under arrest for possession of marihuana, and each patted down. He picked up the "Supergold" envelope and found it contained marihuana, then searched the men. He then searched the passenger compartment of the car, finding on the back seat a black leather jacket belonging to Belton, and on unzipping it, found cocaine, which was sought to be suppressed by Belton. It was held that when a policeman has made a lawful custodial arrest, he may, as a contemporaneous incident of that arrest, search the passenger compartment of the automobile, and he may also examine the contents of any containers found within the passenger compartment. In footnote four, it was said that "container" includes closed or open glove compartments, consoles, or other receptacles, as well as luggage, boxes, bags, clothing and the like. The *Belton* case disposes of appellant's contention that the search of his car and the seizure of the flashlight was invalid, and it is ruled against him.

■ At the time appellant was placed under arrest, Wolverton searched his person and found a single blade pocket knife in his pants pocket. At trial, W—— T—— testified that the knife used by appellant, running it up and down her leg, was like a hunting knife, it had a gold tip on the end, and State's Exhibit 2 "looks like the knife he pulled on me. Q. Do you know if it is? A. Yes. It is—it has the gold. Q. In other words, it is very similar if not the knife? A. It is very similar." Appellant's contention that the knife identified was not the knife used in the commission of the crime is without merit. See *State v. Collins*, 607 S.W.2d 712, 715 (Mo.App.1980), "There is no necessity for proof that the knife be identified specifically as the weapon used. There is no requirement that the identity of a weapon be wholly unqualified to make a weapon admissible in evidence in a criminal case. The weight to be given to the identification is for the jury." See also *State v. Kern*, 447 S.W.2d 571 (Mo.1969). *State v. Merritt*, 460 S.W.2d 591 (Mo.1970), cited by appellant, is not in point because there was in that case that the weapon, a gun, was seen at the time the crime was committed.

■ Appellant contends that there was no chain of custody established as to the knife and the flashlight. Wolverton identified State's Exhibit 2, the knife, as the one he took from appellant. Both the knife and the flashlight were positively identified. "Chain of custody is an irrelevant issue where, as here, the objects in question are positively identified and the objects themselves, rather than their condition, are the significant factor." *State v. Hanson*, 587 S.W.2d 895, 902 (Mo.App.1979). See also *State v. Ingram*, 607 S.W.2d 438, 441 (Mo. 1980). The contention is without merit.

■ By his last point appellant claims that the trial court erred in denying his request for mistrial after the state exhibited during trial a .22 caliber revolver handgun (marked State's Exhibit 3), which was not a gun exhibited by appellant (to the victims). The transcript of the record is incomplete as to what occurred as to this incident, but after oral argument the parties have stipulated the facts to be: Any gun or handcuffs exhibited by appellant during the offenses have never been discovered; L____ H____ testified that appellant exhibited a gun. The Prosecuting Attorney handed to the reporter for marking a .22 caliber revolver handgun which was not a gun exhibited by appellant. There is uncertainty as to precisely when the Prosecuting Attorney was holding the gun. Appellant's counsel stated that when the Prosecuting Attorney asked L____ H____, "During this evening, on how many occasions did you have this gun pointed at you?", he was holding the gun. The Prosecuting Attorney stated that after the question and after the court overruled an objection to it, then he produced the gun. [Note the question referred to *this* gun.] A recess was had and a conversation was had between counsel and the court concerning the gun, during which the Prosecuting Attorney stated to the court that the purpose of marking the revolver was to ask the victims if the gun exhibited by appellant on December 30, 1978, looked like the gun to be marked. Appellant's request for mistrial was denied, and he did not request the court to admonish the jury in any manner

concerning the gun produced by the Prosecuting Attorney. During the remainder of the trial, the gun produced by the Prosecution was not present in front of the jury. After the recess L____ H____ described the gun exhibited by appellant as a .22 caliber long-barrel revolver.

Several cases have condemned the receipt into evidence of weapons, or demonstration of weapons, not connected with the commission of a crime. One of the earliest of these is *State v. Richards*, 334 Mo. 485, 67 S.W.2d 58 (1933), in which a murder occurred during the course of a bank burglary. Empty shells were found near the place of the shooting, and a .38 caliber revolver was taken from witness Thompson, indicating that .38 caliber revolvers had been used. A search warrant described a .38 caliber revolver, being the one taken from Thompson, as being in appellant's home, but no such gun was there found. Instead, a .32 caliber revolver in a sheepskin coat was seized and introduced into evidence. The court held that the articles should have been suppressed, as not being properly described in the warrant. More importantly, the court held that there was no connection shown between a black rag, a money bag and a .38 caliber revolver found in co-defendant Wright's home and appellant, and that evidence was inadmissible for any purpose against appellant. In *State v. Wynne*, 353 Mo. 276, 182 S.W.2d 294 (1944), a .25 caliber pistol found at the scene of the shooting disappeared from the police property room and was not produced at trial. Using a pistol which was the property of a prosecutor's investigator, it being agreed that it had no connection with defendant or the case, the prosecutor cross-examined appellant, using the pistol, to demonstrate how far it extended from her husband's hip pocket. Defense counsel objected to the display of firearms before the jury unless it be identified as the revolver claimed by the state to have been used by the appellant, and on further grounds " 'without any foundation, a fire arm for the subtle effect it will have upon the jury * * * and is of such a highly inflammatory and prejudicial

character as to prejudice the defendant in the eyes of the jury and to make them conscious of the existence of a gun before them.'" In sustaining defendant's position of prejudicial error in the demonstration of the weapon, the court said, 182 S.W.2d page 300, "The objection to the introduction of weapons or other demonstrative evidence, especially when not connected with the defendant or his crime, on the ground of unfair prejudice is based on sound psychological and philosophical principles. They are: 'First, there is a natural tendency to infer from the mere production of any material object, and without further evidence, the truth of all that is predicated of it. Secondly, the sight of deadly weapons or of cruel injuries tends to overwhelm reason and to associate the accused with the atrocity without sufficient evidence.' 4 Wigmore, Evidence, Sec. 1157, p. 254." In *State v. Smith*, 357 Mo. 467, 209 S.W.2d 138 (1948), the admission into evidence in defendant's burglary trial of two pistols found in his wife's purse at the time of his arrest in an auto in which he and his wife were riding was held error. Defendant in *State v. Holbert*, 416 S.W.2d 129 (Mo.1967), was charged with carrying a concealed weapon found on his person, and another found in his car, was held error as the items had "no legitimate probative value." In *State v. Merritt*, 460 S.W.2d 591 (Mo.1970), a gun found outside a tavern following the day when defendant allegedly assaulted another with a gun, was held erroneously admitted into evidence because there was failure to connect defendant with the gun and the gun with the shooting. In *State v. Williams*, 543 S.W.2d 563 (Mo.App.1976), after defendant was arrested in the back seat of an automobile for carrying a concealed weapon, Nimrod, a companion in the front seat, was also arrested for carrying another concealed weapon. Both weapons were received in evidence, and it was held prejudicially erroneous to admit Nimrod's weapon into evidence as it had no logical connection with the proof of the offense with which defendant was charged. See also *State v. Charles*, 572 S.W.2d 193 (Mo.App.1978), where the admission into evidence of a le-

thal weapon totally foreign to the offense for which the accused was on trial was branded as reversible error.

What has been said herein prior to the consideration of appellant's last point may be of guidance in a new trial. Because of prejudicial error in displaying an unconnected weapon to the offenses for which appellant was on trial (that the jury would have "a tendency to infer from a demonstration with it 'the truth of all that is predicated of it' when in fact it had nothing whatever to do with the defendant or the crime." *Wynne*, supra, page 300), the judgment must be reversed and the case remanded for new trial.

It is so ordered.

All concur.